UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP., | No. 1:12-cv-07510-(PAE) (KNF) |
| Plaintiff and Counter-defendant, | |
| -against- | **AMENDED COUNTERCLAIM** |
| D.T. GRUELLE COMPANY GROUP, L.L.C., | |
| Defendant and Counterclaimant. | |

---

Pursuant to Rule 13(a) of the FED. R. CIV. P. and the Court's Individual Rule and Practice 3 F Defendant and Counterclaimant D.T. Gruelle Company Group, L.L.C. ( hereinafter "D.T. Gruelle", "DTG" or "Counterclaimant") files this Amended Counterclaim against Space Exploration Technologies Corp. (hereinafter "SpaceX" or "Counter-defendant") as follows:

## PARTIES

1. Counterclaimant DTG is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 301 Moon Clinton Road, Moon Township, Pennsylvania 15108.  DTG does business as D.T. Gruelle Company.

2. Counter-defendant SpaceX is a Delaware corporation with its principal place of business at 1 Rocket Road, Hawthorne, California 90250.

## JURISDICTION AND VENUE

3. The Court has supplemental jurisdiction over this Amended Counterclaim pursuant to 28 U.S.C. §1367 since it involves the same transaction making up the subject matter of the Complaint.

4. Venue is proper in this Court by agreement of DTG and SpaceX pursuant to ¶ 21 of the terms and conditions of the a contract they entered into on November 22, 2011 entitled "**CUSTOMS POWER OF ATTORNEY/DESIGNATION OF EXPORT FORWARDING AGENT And Acknowledgement of Terms and Conditions**" (hereinafter "the Contract"), a copy of which is attached as Exhibit A, and which is incorporated by reference into this Amended Counterclaim in its entirety. *See e.g., M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907 (1972) (in general, forum selection clauses are prima facie valid).

5. The Court has both general and personal jurisdiction over SpaceX pursuant to its supplemental jurisdiction, and the fact that SpaceX unconditionally and irrevocably agreed to the Contract terms and conditions, including ¶ 21 of the Contract.

## STATEMENT OF FACTS

6. D. T. Gruelle is a Non-Vessel Operating Common Carrier (hereinafter "NVOCC") under the Shipping Act (46 U.S.C. §§ 40101, *et seq.*). Its expertise is in logistics. DTG's operations consist of arranging for the transport of cargo by land, sea, air or a combination of these types of transport on behalf of its customers through contracting with carriers having assets such as ships, trucks or airplanes that can physically carry out the transport needs of shippers that engage DTG, such as SpaceX.

7. DTG's operations sometimes include the transport of critical and other specialty materials. DTG relies on its customers to provide accurate and complete details of shipping, handling and transport requirements for such critical specialty equipment and materials.

8. SpaceX is a corporation engaged in space exploration which has successfully launched rockets into space. SpaceX has technical and engineering expertise in exploring space. SpaceX also has expertise, knowledge and experience with the equipment and materials

necessary to enable it to explore space, including the operation and handling of such equipment and materials.

9. On November 22, 2011, SpaceX and DTG entered into the Contract which provided that DTG would act as an NVOCC on behalf of SpaceX.

10. As part of the Contract, SpaceX unconditionally and irrevocably agreed to the terms and conditions which were expressly acknowledged by SpaceX's President, Gwynne Shotwell and Timothy R. Hughes, Senior Vice President & General Counsel of SpaceX.

11. The Contract expressly provides that D.T. Gruelle Company Terms and Conditions govern all transactions between the DTG and SpaceX.

12. The second sentence of Paragraph 7(c) of the **GENERAL TERMS & CONDITIONS OF SERVICE** of the Contract provides as follows:

> The Customer shall be bound by and warrant the accuracy of all invoices, documents and information furnished to the company (sic) by the Customer or its agent for export, entry or other purposes and the Customer agrees to indemnify and hold the Company harmless against any increased duty, penalty, fine or expense including but not limited to attorneys' fees , costs, and expenses resulting from any inaccuracy, incomplete statement, omission or any failure to make timely presentation of required invoices, documents and information , even if not due to any negligence of the Customer.

13. The transaction under the Contract at issue in this case is the transport of two cryogenic tanks designed to store liquid oxygen (hereinafter "the Tanks") from GasCon (Pty) Ltd ("GasCon"), Cape, South Africa to G.P. Terminals, located at or near the Port of Houston, Texas.

14. Regarding the transport of the Tanks, the communications between SpaceX and DTG demonstrate that SpaceX repeatedly provided inaccurate information to DTG, made material omissions of information regarding the requirements to transport the Tanks, and was repeatedly informed by DTG throughout the course of the transaction that such inaccurate

information and omissions would materially affect the cost of transporting the Tanks, as exemplified by the following:

      a.      From October 26, 2011 to January 26, 2012 ("the initial period"), SpaceX gave DTG six different sets of dimensions and weights for the Tanks [**Set 1:** 53.3' long, 16' diameter, approx.. 90,000 lbs.; **Set 2:** 78.7'long, 11.9' diameter, 99,200 lbs.; **Set 3:** 78.7'long, 13.9' diameter, 99,200 lbs.; **Set 4:** 78.7'long, 13.9' diameter, 99,200 lbs., 14.3' high; **Set 5:** 83.2'long, 13.9' diameter, 97,004lbs., 14.3' high; **Set 6:** 83.2'long, 13.9' diameter, 97,004lbs., 14.7' high.].

      b.      Throughout the initial period, the DTG's quotes to SpaceX for shipping the Tanks varied with the different dimensions and weights given to it by SpaceX.

      c.      None of the information given to DTG by SpaceX throughout the initial period indicated there were any special handling requirements or limitations regarding the transport of the Tanks, and DTG's quotes were based upon the fact that SpaceX's communications did not indicate any special handling requirements or limitations.

      d.      On February 13 and 14, 2012, in response to SpaceX's inquiry regarding the quoted cost increase from $160,000 to $192,000 per Tank, DTG told SpaceX that the rates increased directly proportional to increases in the communicated dimensions of the Tanks.

      e.      On February 16, 2012, DTG communicated to SpaceX that there were six changes to the Tank specifications during the initial period, and each change necessitated a complete review of the rates - inches translate into thousands of dollars, thoroughness is required to ensure a proper price is attained.  DTG again informed SpaceX that the cost of transport was very sensitive and changed with the Tank specifications.

  f. On February 22, 2013, based on the Tank specifications SpaceX gave on January 26, 2012 [**Set 6:**  83.2'long, 13.9' diameter, 97,004lbs., 14.7' high.] and a ready-to-ship date by April 30, 2012, DTG gave a non-binding quote of $182,000 per Tank under Term 5 of the Contract.

  g. On February 24, 2012, SpaceX issued  Purchase Order Number 145090 ("Purchase Order") in the amount of $364,000 for the transport of the two Tanks based upon DTG's February 22, 2012, non-binding quote.  SpaceX's Purchase Order provided it was "For 2 GasCon LOX tanks OT A and B shipment Order Specifications Vandenberg – Shipping of OT-A and B for Vandenberg LOX farm.  Pablo Ucar negotiated down $14,000 for final shipping dimensions of 83.2' L x 13.9' D x 14.7' H – 97,004 lbs".  The Purchase Order set forth "4/30/2012" as both the "Due Date" and the "Promise Date".

  h. SpaceX's contention that the Purchase Order consists of one of two contracts governing the transport of the Tanks and that it shows there was a fixed price agreement between DTG and SpaceX demonstrates SpaceX's breach of its warranty regarding the accuracy of the documents and information it furnished to DTG for the following reasons:

    1) The Purchase order was based on inaccurate and incomplete information provided by SpaceX to DTG regarding the special handling requirements of the Tanks which materially caused the actual transport height to increase (see below), required special trailers and permits, and caused costly delays.

2) The Purchase order was based on a ready to ship date by April 30, 2012 when in fact the Tanks were not ready for shipment until the first week of August 2012, a more costly time to charter a vessel.

3) The Purchase Order was for a shipment to Vandenberg AFB, California when the actual shipment was to the Port of Houston, Texas.

4) The price on the Purchase Order and its terms and conditions do not accurately reflect the actual circumstances of the transport of the Tanks which actually took place.

i. On July 13, 2012, DTG informed SpaceX that GasCon's projected readiness date of June 20, 2012 was ultimately not kept, and that vessel owners resent false bookings and cancellations.

j. On July 18, 2012, DTG was informed for the first time that the Tanks "are not able to be transported in any way other than on their saddles….Cryogenic tanks such as these are a rather complicated design that consists of one tank inside another to allow for thermal contraction. The outer tank is a very thin-walled tank…It cannot support a significant load. The load of the inner vessel is transmitted to the saddles by strategically placed supports. Placing the tank on its side makes these supports ineffective."

k. In response to the above new special handling requirements DTG immediately informed SpaceX on July 18, 2012, that "These details make a substantial difference, since the hope was to lower the problem over height!"

l. On July 18, 2012 SpaceX requests that GasCon specify the "as built dimensions of the saddles' locations for these two tanks…the current as built dimensions shown in elevation view", and "an as built verification of the nozzle locations now" and

also requests measurements of certain piping nozzles. This e-mail communication indicates that even SpaceX did not know, as of July 18, 2012, the "as built dimensions" of critical parts of the Tanks such as the saddles and other parts which would materially affect the conditions and costs of transport.

  m. On July 30, 2012, GasCon indicates by email it has responded to SpaceX's July 18, 2012 request for the "as built" dimensions of the tanks. This communication indicates that over five months after SpaceX issued its Purchase Order to DTG, SpaceX still did not know the "as built" dimensions of the Tanks, and therefore, knew that the information it had given DTG did not provide a reasonable basis for DTG to quote a cost for transporting the two Tanks.

  n. Based on an inspection of the Tanks at GasCon on August 1, 2012, DTG's South African agent, GAC Laser, finds that the Tank specifications SpaceX previously gave to DTG were inaccurate and that combined with the previously omitted fact the Tanks could only be transported on their saddles, the final height of the Tanks on the special trailer exceeded the permit limit of 5.5 meters (18') requiring a much more costly and difficult to obtain "super abnormal load" permit and the use of a different type of trailer. The need for a different type of trailer was much more costly. The need to use the ALE trucking company multi-wheel trailer, plus the need for a "super abnormal permit" not only increased expenses and charges, but also caused delays.

  o. On August 2, 2012, David Ball of SpaceX who was at GasCon sent an email to others at SpaceX that GAC Laser had contracted with ALE to use its multi-wheeled transporter to transport the tanks to port, and that "[t]his is the best possible method of transfer."

      p.      On August 8, 2012, DTG tells SpaceX, that DTG will withdraw from the project, if that is what SpaceX wants.  DTG specifically asks SpaceX what it wants DTG to do at this time.

      q.      On August 8, 2012, SpaceX asks DTG for a new quote.  DTG notifies SpaceX of (i) the increased costs over the non-binding quote DTG gave back on February 22, 2012, and (ii) the significance of the newly disclosed Tank specifications and special handling requirements.

      r.      On August 15, 2012 DTG's South African agent, GAC Laser, and ALE commenced the transport of the Tanks from GasCon to the Cape Town Port, and sent SpaceX an invoice for the increased costs of the shipment, since SpaceX has instructed DTG to proceed with the transport at least to Houston, Texas.

      s.      On August 20-21, 2012, the Tanks are transferred to the sea vessel Sophie at the Cape Town Port.

      t.      On August 27, 2012, DTG sends SpaceX a "Cost Sheet" breaking down the increased actual costs and charges resulting from the inaccurate information and material omissions when compared with the non-binding quote DTG gave on February 22, 2012, the same amount on the Purchase Order.

15.      As a result of the above referenced inaccurate information SpaceX conveyed to DTG, and SpaceX's material omissions regarding the special handling requirements of the Tanks, the actual costs and expenses increased over the non-binding quote of $194,191 given on February 22, 2012 to $339,802 for transporting the Tanks from GasCon in South Africa to Houston, Texas.  These increased costs and charges arose from increased truck transport charges,

rigging fees, permit charges, route survey charges, port charges, handling and forwarding charges, ocean freight charges, a dead weight surcharge and an inducement cost.

16. As a result of SpaceX's above referenced inaccurate information conveyed to DTG, and SpaceX' material omissions regarding the special handling requirements for the Tanks, SpaceX caused DTG to give it a non-binding quote on February 22, 2012, which was based on inaccurate and incomplete information, this set of circumstances in turn caused SpaceX to erroneously commence this case for alleged wrongful increased costs and charges which were the product of its own misinformation or the lack of information, and caused DTG to incur and continue to incur costs and its attorneys' fees for this litigation.

17. Pursuant to Rule 10(c) of the FED. R. CIV. P., DTG repeats, states, re-alleges and incorporates by reference in their entirety, as if fully set forth below, its responses and averments contained in DTG's ANSWER WITH AFFIRMATIVE DEFENSES (Document Number 7).

## CLAIM

### BREACH OF CONTRACT AND CLAIM FOR INDEMNIFICATION BASED ON SPACEX's PROVIDING INACCURATE AND INCOMPLETE INFORMATION TO D.T. GRUELLE

18. DTG repeats, states, re-alleges and incorporates by reference in their entirety, as if fully set forth below, paragraphs 1 through 17 of this Amended Counterclaim.

19. SpaceX was bound by and warranted the accuracy of all documents and information provided to DTG under the second sentence of Paragraph 7(c) of the Contract.

20. SpaceX agreed to indemnify and hold DTG harmless against any increased penalty, fine or expense, including but not limited to attorneys' fees, costs, and expenses resulting from any inaccuracy, incomplete statement, omission or any failure to make timely

presentation of required documents and information, even if not due to any negligence of SpaceX under the second sentence of Paragraph 7(c) of the Contract.

21. SpaceX breached its warranty in the second sentence of ¶7(c) of the Contract since it conveyed inaccurate documents and information to DTG regarding the ready to ship date of the Tanks, actual shipment dimensions of the Tanks and omitted material information concerning the special handling and restrictions regarding transport of the Tanks.

22. As a result of SpaceX conveying inaccurate information to DTG and omitting material information additional expenses, charges and costs were incurred in the actual transport of the tanks over the non-binding quote previously given by DTG to transport the tanks for which SpaceX now makes claims against DTG in this case, but for which SpaceX is liable to DTG in indemnity under the second sentence of Paragraph 7(c) of the Contract.

23. As a result of SpaceX conveying inaccurate information to DTG and omitting material information, SpaceX caused DTG to give a non-binding quote based on inaccurate and incomplete information which in turn caused SpaceX to erroneously commence this case against DTG, for which SpaceX is liable to DTG in indemnity for DTG's costs and attorneys' fees under the second sentence of Paragraph 7(c) of the Contract.

24. Under the second sentence of ¶7(c) of the Contract, SpaceX's obligation to be bound by and warrant the accuracy of documents and information it, or its agents, furnished to DTG, and SpaceX's express agreement to indemnify and hold DTG harmless against any increased penalty, fine or expense, including but not limited to attorneys' fees, costs and expenses resulting from any inaccuracy, incomplete statement, or omission are unequivocally referable to claims between DTG and SpaceX, and support an inference that SpaceX promised to indemnify DTG for attorneys' fees, costs and expenses in an action on the Contract.

## **PRAYER FOR RELIEF**

WHEREFORE, on the basis of the foregoing D.T. Gruelle respectfully requests that the Court:

1. Enter judgment for DTG and against SpaceX holding SpaceX liable in indemnification to DTG, and liable to indemnify and hold DTG harmless for any and all liability, loss, damages, costs, claims and/or expenses, including but not limited to attorney's fees, which DTG may incur as the result of the inaccurate and incomplete documents and information SpaceX provided to DTG, and as a result of SpaceX's omissions; and

2. Award DTG monetary damages for the full amount of all liability, loss, damages, costs, claims and/or expenses, including but not limited to attorney's fees, which DTG incurs as the result of the inaccurate and incomplete documents and information SpaceX provided to DTG, and as the result SpaceX's omissions.

## **JURY DEMAND**

D.T. Gruelle demands a trial by jury to the extent there are issues triable to a jury,

Dated: New York, New York
       January 7, 2013

Respectfully submitted,

HUSCH BLACKWELL LLP

By: /s/ Daniel P. Jaffe
Daniel P. Jaffe
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  (212) 485-9805
Facsimile:   (314) 480-1505
Dan.Jaffe@huschblackwell.com

Carlos Rodriguez (*pro hac vice* forthcoming)
HUSCH BLACKWELL LLP
750 17th Street N.W.
Suite 900
Washington, D.C. 20006
Telephone: (202) 378-2300
Fax: (202) 378-2319
Carlos.rodriguez@huschblackwell.com

*Attorneys for Defendant D.T. Gruelle Company Group, L.L.C.*

### CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2013, I electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system and that all counsel of record will be served via the Notice of Electronic Filing generated by CM/ECF.

/s/ Daniel P. Jaffe