UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SPACE EXPLORATION TECHNOLOGIES CORP.  :
                                                                                         :     1:12-cv 07510 (PAE)(KNF)

        Plaintiff and Counter-defendant,  :
                                                                             :  **D.T. GRUELLE'S**
           -v-                              :  **RESPONSE TO**
                                                                                :  **SPACEX'S FIRST**
D.T. GRUELLE COMPANY GROUP, L.L.C.,  :  **REQUESTS FOR**
                                                                                :  **ADMISSION**
       Defendant and Counterclaimant.  :
                                                               :
------------------------------------------------------------------------X

       D. T. Gruelle Company Group, L.L.C. (hereinafter "DTG", "Defendant" or "Counterclaimant") hereby responds and objects to Plaintiff's and Counter-defendant's ("SpaceX's") First Set of Requests for Admission (hereinafter "the requests for admission" or "request for admission") as follows:

## General Objections and Statements

       1.    Defendant objects to each and every request for admission to the extent that it seeks information protected from discovery by the attorney-client privilege, the work product immunity doctrine or any other privilege.

       2.    Defendant objects to each and every request for admission that purports to require Defendant to search for information not within Defendant's possession, custody or control. To do so would place an undue added burden upon Defendant.

       3.    Defendant objects to each definition, instruction, or paragraph of the requests for admission to the extent that it purports to require or infers a duty or burden to provide discovery, or a burden to supplement beyond the permissible scope of the Federal Rules of Civil Procedure ("hereinafter "FRCP") or the Local Rules of the United States District Court for the Southern District of New York (hereinafter "Local Rules USDC, SDNY").

4. Defendant objects to each and every request for admission to the extent it calls for Defendant's confidential and/or proprietary information, documents and things.

5. Defendant objects to each and every request for admission to the extent it imposes an undue burden. For example, and without limitation, Defendant objects to those requests for admission to the extent that they call for Defendant to produce information that already has been disclosed to Plaintiff or to the extent that a request for admission seeks information that is merely cumulative of other information that is the subject of other paragraphs of the requests for admission.

6. Defendant objects to each and every paragraph of the requests for admission to the extent it seeks a discovery response via a request for admission when the information sought may be more readily obtainable by other, less burdensome or less invasive means, including without limitation by deposition wherein specific questions may be posed and answered (if proper) without providing unnecessary information in a medium which can more easily disclosed to a competitor.

7. Defendant objects to each paragraph of the requests for admission to the extent that it seeks discovery which is neither relevant, nor reasonably calculated to lead to the discovery of admissible evidence.

8. These responses are made without waiver of and with preservation of:

(a) all questions as to competency, relevancy, materiality, privilege and admissibility of the answers and the subject matter thereof as evidence for any purpose and in any further proceeding in this action (including the trial of this action) and in any other action;

(b) the right to object to the use of any such answers or the subject matter thereof, on any ground in any further proceeding in this action (including the trial of this action) and any other action;

(c) the right to object on any ground at any time to an request for admission, demand or request for further response to these or any other requests for admission or other discovery proceedings involved or related to the subject matter of the discovery to which these answers or responses are provided; and

(d) The right at any time to review, correct, add to, supplement or clarify any of the answers or responses contained herein.

9. The following answers or responses are based upon a good faith review by Defendant and based upon information and documents presently available to and located by Defendant and its attorneys as of this time.

10. Defendant is willing to discuss its objections and to attempt in good faith to resolve them or narrow the differences between the parties.

11. Defendant is still in the process of gathering documents and acquiring information about which the requests for admission inquire. Defendant therefore reserves the right to amend and supplement its answers or responses to those paragraphs of the requests for admission as further information or documents become known and available to it.

12. The information supplied in the following answers and responses is based upon Defendant's knowledge. These responses represent the best information available at this time, and Defendant specifically reserves the right to supplement and/or amend its responses if and when additional information becomes available.

13.     The word usage and sentence structures in these responses are that of the attorneys who have prepared the responses and are not purported to be the exact language of Defendant.

14.     These general objections and statements apply to all of Plaintiff's paragraphs of the requests for admission.  To the extent that the specific objections and/or statements are made herein in response to specific paragraphs of the requests for admission, those specific citations are provided because they are believed to be particularly applicable to the request for admission and are not to be construed a waiver of any General Objections and/or Statements applicable to information or documents and things falling within the scope of other requests for admission where they are not specifically referenced.

## DEFINITIONS AND INSTRUCTIONS

1.     Defendant shall respond and supplement its answers and responses to the requests for admission in accordance with the FRCP and the Local Rules USDC, SDNY.  To the extent Plaintiff's instructions or definitions violate or exceed the requirements of these rules, Defendant objects to such instructions or definitions.

2.     The Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 of the Local Rules USDC, SDNY shall apply to Plaintiff's requests for admission and to these answers and responses.

3.     Defendant objects to any definition defining "you" or "your" that purports to address the requests for admission to non-parties and to broaden the definition of "defendant" as defined in Local Civil Rule 26.3(c)(5) of the Local Rules USDC, SDNY in violation of Local Civil Rule 26.3, *supra*.

4. Defendant objects to any instruction or definition to the extent it purports to require Defendant to provide information about the disposition of information or a document, or the identity of the person currently in possession or control of such information or document where such information is beyond the knowledge of Defendant.

5. Defendant objects to any instruction or definition to the extent it purports to require Defendant to provide information beyond the scope of discovery or information which is protected by privilege (including work product), or would disclose Defendant's confidential and/or proprietary information.

6. "DTG Contract" means the "**CUSTOMS POWER OF ATTORNEY/DESIGNATION OF EXPORT FORWARDING AGENT And Acknowledgement of Terms and Conditions**" which was entered into between SpaceX and DTG on November 22, 2011.

7. "SpaceX Purchase Order" means SpaceX Purchase Order Number 145090 dated February 24, 2012 issued to DTG with its Terms and Conditions in connection with the Tank Transport.

## REQUESTS FOR ADMISSION

1. Admit that planning shipments is DTG's expertise.

**ANSWER**: **DTG denies this request except as expressly stated and admitted in the following:  DTG admits that it has expertise in planning, arranging, managing and overseeing the transport or shipment of cargo by land, sea or air or a combination of these types of transport, however, the application of this expertise is dependent upon receiving accurate and complete information from the shipper or its designee regarding (a) the dimensions and weight of the cargo to be transported; (b) the handling requirements of the cargo to be transported, including without limitation the extent to which the cargo can be maneuvered or re-oriented for shipment; (c) the location dates and times the cargo will be available for transport from point of origin; and (d) the location dates and times the cargo must be delivered to destination.  The quality of planning and other aspects of transporting cargo is necessarily a collaborative process between the shipper and the common carrier.  SpaceX represented it had knowledge and expertise about the size and characteristics of the Tanks, and DTG relied upon SpaceX's representation of this expertise, but SpaceX**

**failed to provide accurate and complete information regarding the Tanks and Tank Transport.**

2.      Admit that SpaceX notified DTG that the Tanks would have saddles.

**ANSWER**:  **Admit.**

3.      Admit that SpaceX notified DTG that the saddles would increase the height of the Tanks.

**ANSWER**:  **Objection, this request for admission seeks irrelevant information. Specifically, it is the transport height of the Tanks rather than the height of the Tanks per se that is relevant to this case.  Subject to and without waiving this objection, DTG denies this request for admission, except as expressly admitted and stated below:  DTG admits that SpaceX sent drawings which showed that the saddles added height to the Tanks when the Tanks rested on their saddles, but SpaceX gave no indication that the saddles would increase the transport height of the Tanks until July 18, 2012.  DTG denies that SpaceX notified it that the saddles would increase the transport height of the tanks until July 18, 2012 when SpaceX notified DTG that the Tanks could only be transported on their factory installed saddles.**

4.      Admit that on December 13, 2011, Vincent Werner of SpaceX referenced "the added height due to the saddles" in an email to Alessandra Busatta Gruelle, Terese Duncan, Tim Gruelle, and Marco Gruelle of DTG.

**ANSWER**:  **Objection.  This request for admission seeks irrelevant information because the above referenced December 13, 2011 email from Vincent Werner refers to different tank design/dimensions from the design/dimensions of the Tanks which were involved in the Tank Transport.  This request for admission is also irrelevant because it pertains to the height reflected in a tank design rather than the transport height of the tank.  Subject to, and without waiving these objections, DTG denies this request.  In further response, DTG states SpaceX did not inform it that the transport height of the Tanks was increased by the saddles until July 18, 2012.**

5.      Admit that DTG, through its employees, received the email referenced in Request 4.

**ANSWER**:  Objection.  This request for admission seeks irrelevant information because the above referenced December 13, 2011 email from Vincent Werner refers to different tank design/dimensions from the design/dimensions of the Tanks which were involved in the Tank Transport.  This request for admission is also irrelevant because it pertains to the height reflected in a tank design rather than the transport height of the tank.  Subject to, and without waiving these objections, DTG denies this request.  In further response, DTG states SpaceX did not inform it that the transport height of the Tanks was increased by the saddles until July 18, 2012.

6.      Admit that on January 26, 2012, Vincent Werner of SpaceX sent new tank drawings to Terese Duncan and Marco Gruelle of DTG by email.

**ANSWER**: **Admit.**

7.      Admit that DTG, through its employees, received the email referenced in Request 6.

**ANSWER**:  **Admit.**

8.      Admit that on January 26, 2012, Vincent Werner stated in an email to Terese Duncan and Marco Gruelle of DTG that "[T]here is one significant change.  The saddle height has increased."

**ANSWER**:  Objection.  This request for admission seeks irrelevant information because it pertains to the height reflected in the Tank design rather than to the transport height of the Tank.  Subject to and without waiving this objection, DTG denies this request for admission since it misquotes the email DTG received from Vincent Werner of SpaceX on January 26, 2012.  DTG admits that it received an email from Vincent Werner of SpaceX on January 26, 2012 which states in relevant part:  "I have new tank drawings from GasCon.  There is one significant change.  The saddle height has increased.  The new dimensions are: 13.9' D x 14.7 H x 83.2' L"

9. Admit that DTG, through its employees, received the email referenced in Request 8.

**ANSWER**: Objection. This request for admission seeks irrelevant information because it pertains to the height reflected in the Tank design rather than the transport height of the Tank. Subject to and without waiving this objection, DTG denies this request for admission since it misquotes the email DTG received from Vincent Werner of SpaceX on Janaury26, 2012. DTG admits that it received an email from Vincent Werner of SpaceX on January 26, 2012 which states in relevant part: "I have new tank drawings from GasCon. There is one significant change. The saddle height has increased. The new dimensions are: 13.9' D x 14.7 H x 83.2' L"

10. Admit that on January 26, 2012, Vincent Werner stated in an email to Terese Duncan and Marco Gruelle of DTG that the new dimensions of the Tanks was 13.9' D x 14.7' H x 83.2' L.

**ANSWER**: Admit.

11. Admit that DTG, through its employees, received the email referenced in Request 10.

**ANSWER**: Admit.

12. Admit that DTG quoted $182,000 per Tank for the Tanks Transport in February 2012.

**ANSWER**: DTG denies this request for admission, except as expressly admitted and stated in the following: DTG admits that it made a non-binding quote of $182,000 per Tank for the Tank Transport in February pursuant to ¶ 5 of the DTG Contract which expressly and affirmatively provides that such quotes are non-binding and subject to change without notice.

13. Admit that DTG did not affirmatively state that the quote of $182,000 per Tank for the Tanks Transport was non-binding or subject to change.

**ANSWER**: Deny.

14.     Admit that Laura Gonzalez of SpaceX sent the Purchase Order to DTG by email on February 24, 2012.

**ANSWER**: **Admitted in part and denied in part as follows: DTG admits that it received from Laura Gonzalez of SpaceX, the SpaceX Purchase Order on February 24, 2012. Except as expressly admitted and stated in the preceding, DTG denies this request for admission.**

15.     Admit that DTG, through its employees, received the email referenced in Request 14.

**ANSWER**: **Admitted in part and denied in part as follows: DTG admits that it received from Laura Gonzalez of SpaceX, the SpaceX Purchase Order on February 24, 2012. Except as expressly admitted in the preceding, DTG denies this request for admission.**

16.     Admit that DTG did not reject the Purchase Order between February 2012 and May 2012.

**ANSWER**: **Objection, vague and overbroad. Objection to the statement of the time period which is not clearly defined, but DTG assumes it covers the period of March 1, 2012 through April 30, 2012, the time period between February 2012 and May 2012. Subject to and without waiving these objections, DTG denies this request for admission, except as expressly admitted and stated in the following: DTG proceeded with the Tank Transport pursuant to the DTG Contract. DTG did not reject the SpaceX Purchase Order because the DTG Contract, including its Terms & Conditions governed the Tank Transport transaction, and there was no need to reject the SpaceX Purchase Order which was subordinate to the DTG Contract.**

17.     Admit that DTG did not inform SpaceX that the Purchase Order was inaccurate between February 2012 and May 2012.

**ANSWER**: **Objection, vague and overbroad. Objection to the statement of the time period which is not clearly defined, but DTG assumes it covers the period of March 1, 2012 through April 30, 2012, the time period between February 2012 and May 2012. Subject to**

and without waiving these objections, DTG denies this request for admission, except as expressly admitted and stated in the following: DTG proceeded with the Tank Transport pursuant to the DTG Contract. DTG did not inform SpaceX that the SpaceX Purchase Order was inaccurate because (a) the DTG Contract governed the Tank Transport transaction; and (b) during the period of March 1, 2012 to April 30, 2012, DTG did not know that there would be a material breach of the April 30, 2012 promise date, or that the Tanks required special handling as a super abnormal load.

18.     Admit that DTG did not inform SpaceX that the Purchase Order was invalid between February 2012 and May 2012.

**ANSWER**: Objection, vague and overbroad. Objection to the statement of the time period which is not clearly defined, but DTG assumes it covers the period of March 1, 2012 through April 30, 2012, the time period between February 2012 and May 2012. Subject to and without waiving these objections, DTG denies this request for admission, except as expressly admitted and stated in the following: DTG proceeded with the Tank Transport pursuant to the DTG Contract. DTG did not inform SpaceX that the SpaceX Purchase Order, was invalid because (a) the DTG Contract governed the Tank Transport transaction; and (b) the SpaceX Purchase Order during the period of March 1, 2012 to April 30, 2012 was supposedly valid to the extent it purportedly provided additional information about the Tank Transport such as the Promise Date of "4/30/2012"and the method of shipment.

19.     Admit that DTG did not dispute the price stated in the Purchase Order between February 2012 through May 2012.

**ANSWER**: Objection, vague and overbroad. Objection to the statement of the time period which is not clearly defined, but DTG assumes it covers the period of March 1, 2012 through April 30, 2012, the time period between February 2012 and May 2012. Subject to and without waiving these objections, DTG denies this request for admission, except as expressly admitted and stated in the following: DTG proceeded with the Tank Transport pursuant to the DTG Contract. DTG did not dispute the amount appearing on the SpaceX Purchase Order because (a) the DTG Contract governed the Tank Transport transaction; and (b) the amount appearing on the SpaceX Purchase Order was a non-binding quote of $364,000 for the Tank Transport given by DTG in February pursuant to ¶ 5 of the DTG Contract which expressly and affirmatively provides that such quotes are non-binding and subject to change without notice.

20.     Admit that DTG commenced performance on or before February 2012.

**ANSWER**:  **Objection vague since this request for admission does not specify what DTG had commenced performing on or before February 2012.  Subject to and without waiving this objection, DTG admits that on or before February 2012 it provided non-binding quotes, subject to change at any time without notice pursuant to ¶5 of the DTG Contract.  These quotes were based on inaccurate and incomplete information provided by SpaceX about the Tanks and Tank Transport.  Except as expressly admitted and stated in the preceding sentences, DTG denies this request for admission.**

21.     Admit that DTG, through employee Alessandra Busatta Gruelle, stated in a July 13, 2012 email that DTG "started to work on this project, with snow on the ground, in February!"

**ANSWER**:  **Objection.  This request for admission takes the quoted portion of the referenced email out of context.  Subject to and without waiving this objection, DTG denies this request for admission as stated above, but admits to the entire email which was produced to SpaceX as DTG-000219 – DTG-000220.**

22.     Admit that DTG did not use the most updated information from SpaceX when determining its quote for Tanks Transport in February 2012.

**ANSWER**:  **Objection, this request for admission seeks irrelevant information.  Specifically, the updated information SpaceX provided on or about January 26, 2012, and that DTG relied upon for its non-binding quote, materially omitted the fact that the Tanks could only be transported on the saddles that were installed on the Tanks at the factory.  Therefore, the most updated information from SpaceX was inadequate to inform DTG of the effective dimensions for transport, such as the transport height of the Tanks.  Subject to and without waiving these objections, DTG denies this request for admission, except as expressly admitted and stated below:  DTG admits that on January 26, 2012, SpaceX sent updated drawings which showed a different design height for the Tanks, but SpaceX gave no indication that the saddles would increase the transport height of the Tanks until July 18, 2012.  DTG denies that SpaceX notified it that the saddles would increase the transport height of the tanks until July 18, 2012 when SpaceX notified DTG that the Tanks could only be transported on their factory installed saddles.  DTG admits that cost estimate information provided by some of its carriers may have been based on an earlier height dimension, but denies that this was relevant or material because none of the height information SpaceX provided prior to the non-binding quote DTG gave on February 22, 2012, enabled DTG to determine the transport height of the Tanks.**

23. Admit that the first tank was picked up by DTG's shipping agent/trucker on or before August 15, 2012.

**ANSWER**: DTG d**enies this request for admission, except as expressly stated and admitted as follows: DTG Admits that its shipping agent/trucker picked up the first of the two Tanks on August 15, 2012.**

24. Admit that on August 22, 2012, DTG quoted the Inland Houston to California portion of the Tanks Transport at $344,070.00.

**ANSWER**: **DTG denies this request for admission except as expressly stated and admitted as follows: On August 22, 2012, DTG gave a non-binding quote of $344,070.00 (+) or (-) 10% for transporting the Tanks from Houston to Vandenberg AFB, CA 93437.**

25. Admit that DTG was aware that delivery of the Tanks was critical to SpaceX.

**ANSWER**: **Denied in part and admitted in part as follows: DTG admits that SpaceX told it that delivery of the Tanks was critical to SpaceX. DTG denies that it was aware that delivery of the Tanks was critical to SpaceX independent of what SpaceX told it.**

26. Admit that DTG would not have given the bill of lading for the Tanks to SpaceX until it was given a cashier's check for $468,988.96.

**ANSWER**: **Denied, except as expressly stated and admitted as follows: The amount DTG demanded that SpaceX pay before it would release the Tanks to SpaceX, $468,988.96, was not an unjustified or arbitrary amount, but rather was the total amount due and owing to DTG not only for transporting the Tanks but also for other prior shipments of other cargoes previously invoiced to SpaceX as follows:**

> **Invoice No. 7001296-001**, dated 8/15/2012 for a Balance of **$339,802.00** due on 8/25/2012 for the transport of the Tanks from GasCon in South Africa to Houston [Note: a breakdown of this balance was sent to SpaceX on 8/27/2012 –"Cost Sheet" sent via email to Pablo Ucar from Tim Gruelle];
>
> **Invoice No. 7001296-002**, dated 9/12/2012 for a Balance of **$886.25** due on 9/22/2012 for the Customs, Duties, Fees and Taxes relating to the import of the 2 Tanks from GasCon in South Africa to Houston;
>
> **Invoice No. 7001103-001**, dated 7/30/2012 for a Balance of **$26,799.01** due on 8/9/2012 for the shipment of MMH – Methylhydrazine 2Pieces from Hanau to Houston [Balance broken down on Invoice];

   **Invoice No. 7001185-001**, dated 8/13/2012 for a Balance of **$37,420.96** due on 8/23/2012 for the shipment of Aluminum Plates 250 4CTN Air Freight from France [Balance broken down on Invoice];

   **Invoice No. 7001276-001**, dated 8/17/2012 for a Balance of **$30,197.00** due on 8/27/2012 for the shipment of Aluminum Plates 250 3CTN Air Freight from France [Balance broken down on Invoice];

   **Invoice No. 7001282-001**, dated 8/30/2012 for a Balance of **$17,830.44** due on 9/9/2012 for the shipment of Aluminum Sheets from France to El Segundo, CA [Balance broken down on Invoice]; and

   **Invoice No. 7001304-001**, dated 8/30/2012 for a Balance of **$16,053.30** due on 9/9/2012 for the shipment of Aluminum Sheets 1CTN Air Freight from France [Balance broken down on Invoice].

**The sum total of these seven invoice amounts equals $468,988.96, the exact amount DTG demanded on or about September 18, 2012, before it would deliver the original Bill of Lading and related papers to SpaceX. All of these invoices had been sent to SpaceX prior to this demand and all amounts were due on or prior to September 22, 2012, the date on the cashier's check tendered to DTG just after September 22, 2012.**

Dated: May 15, 2013
    New York, New York

              Respectfully submitted,

              HUSCH BLACKWELL LLP

            By: /s/ Daniel P. Jaffe
              Daniel P. Jaffe
              60 East 42nd Street, Suite 4600
              New York, NY 10165
              Telephone: (212) 485-9805
              Facsimile: (314) 480-1505
              Dan.Jaffe@huschblackwell.com

              Carlos Rodriguez (*pro hac vice* forthcoming)
              HUSCH BLACKWELL LLP
              750 17th Street N.W., Suite 900
              Washington, D.C. 20006
              Telephone: (202) 378-2300
              Fax: (202) 378-2319
              Carlos.rodriguez@huschblackwell.com

              *Attorneys for Defendant D.T. Gruelle Company Group, L.L.C.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 15, 2013, I electronically mailed a true and correct copy of the foregoing D.T. Gruelle's Answers And Objections to SpaceX's First Set of Requests for admission to Douglas P. Lobel and Marybeth Shreiner, Cooley LLP, 11951 Freedom Drive, Reston, Virginia 20190, and Jason Koral, 1114 Avenue of the Americas, New York, New York 10036, attorneys for Plaintiff and Counter-defendant.

                                            /s/ Daniel P. Jaffe